UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| CLAUDETTE PEEVY, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:08-CV-00111 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Claudette Peevy appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

### I. PROCEDURAL HISTORY

Peevy applied for DIB and SSI in the spring of 2004, alleging that she became disabled as of July 21, 2003. (Tr. 16, 55-57.) The Commissioner denied her application initially and upon reconsideration, and Peevy requested an administrative hearing. (Tr. 26-27, 38-39, 44-47.) A hearing was conducted by Administrative Law Judge (ALJ) Frederick McGrath on September 8,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

2006, at which Peevy, who was represented by counsel, and a vocational expert testified. (Tr. 199-217.)

On January 8, 2007, the ALJ rendered an unfavorable decision to Peevy, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments. (Tr. 16-25.) The Appeals Council denied Peevy's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.) Peevy filed a complaint with this Court on April 28, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. PEEVY'S ARGUMENTS

Peevy alleges several flaws with the Commissioner's final decision. Specifically, Peevy claims that the ALJ (1) improperly evaluated the credibility of Peevy's testimony concerning her symptoms; (2) erred by concluding that Peevy was not disabled under the failure-to-follow medical treatment regulation, and (3) did not properly consider the opinions of Dr. Bundza, a consulting psychiatrist; Dr. Tallon, her treating family practitioner; and Ms. Stouder, her treating mental health therapist. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 11-19.)

## III. FACTUAL BACKGROUND[2]

### A. Background

At the time the ALJ issued his decision, Peevy was forty-two years old; had a high school education and one year of college; and possessed work experience as a stock picker and packer. (Tr. 13, 55, 65, 130.) Peevy alleges that she became disabled due to major depression. (Tr. 59;

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 217-page administrative record necessary to the decision.

Opening Br. 1.)

At the hearing, Peevy testified that she lives in a townhouse with her three daughters, ages twenty-three, twenty, and ten. (Tr. 204.) She stated that primarily spends her days in her room watching a movie or reading, even eating her meals there, though sometimes she will go downstairs and spend time with her ten-year-old daughter. (Tr. 205, 211.) She explained that her daughters do most of the housework, meal preparation, and driving, elaborating that her depression interferes with her ability to safely perform these tasks. (Tr. 211, 214.) She has no activities or friends. (Tr. 206, 211.)

Peevy further testified that she quit her last job because her father was dying and she was "depressed and couldn't function right." (Tr. 203.) She tried on two separate occasions to go back to school for culinary arts in 2004 or 2005 at Ivy Tech with the hopes of opening a catering business, but could not finish due to her depression. (Tr. 207-08.) She confided that she has trouble concentrating and sleeping, and that she has thoughts of suicide, stating that she is ready to join her deceased parents when her youngest daughter turns eighteen. (Tr. 205-06, 210, 211.) Peevy takes various medications for her depression, but declined electroshock therapy ("ECT") when it was recommended. (Tr. 213.)

*B. Summary of the Relevant Medical Evidence*

On July 22, 2003, Peevy was evaluated at Parkview Behavioral Health upon referral from her family doctor for depression. (Tr. 133-37.) She reported low self-esteem, reduced appetite, disturbed sleep, increased anxiety, loss of focus, and that she was unable to work even though she had just started a new job a week earlier. (Tr. 133-37.) She was on Paxil and Xanax for her depression. (Tr. 135.) Parkview assigned her a diagnosis of major depressive disorder, single

episode, and a Global Assessment of Functioning (GAF) score of 60, indicating a moderate degree of symptoms.[3] (Tr. 135.) She was given some referrals and was to call back if her condition worsened. (Tr. 136.)

Between November 24, 2003, and April 28, 2004, Peevy was under the care of Dr. Herbert Trier, a psychiatrist, and she received thirteen individual psychotherapy and medication management sessions. (Tr. 147.) During that time, Peevy remained preoccupied with her father's death and conflicts with her sister, reporting suicidal thoughts and an inability to sleep or eat. (Tr. 149.) Dr. Trier prescribed medications, including Paxil, Remeron, Soltab, Trazoden, Sonata, and Pamelor, but he noted that Peevy did not always take her medication as prescribed. (Tr. 149-51.) On several occasions, Dr. Trier recommended that Peevy be hospitalized and undergo ECT, but she refused. (Tr. 150.) Peevy began skipping appointments and in April 2004 stated that she would seek treatment elsewhere and thus would not be returning to Dr. Trier. (Tr. 147.) On April 28, 2004, Dr. Trier provided a report to the Social Security Administration in which he diagnosed Peevy with a major depressive disorder, single episode, severe without psychotic features, and assigned her a GAF of 50, indicating serious symptoms. (Tr. 147-51.)

Between May 7 and May 25, 2004, Peevy saw Floie Stouder, a licensed clinical social

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.* A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

worker, who on May 28, 2004, issued a psychiatric status report countersigned by Kevin Wieland, Psy.D. (Tr. 139-45.) Ms. Stouder assigned a diagnosis of recurrent major depression and general anxiety; a current GAF of 50, indicating serious symptoms; and a highest GAF in the past year of 61, indicating mild symptoms. (Tr. 139.) Ms. Stouder documented that Peevy was motivated and cooperative, but dependent in nature, as she was always accompanied by her daughters. (Tr. 140.) Her thought processes were logical, although occasionally clouded and distracted. (Tr. 140.) Her concentration was poor as she was unable to continue tasks for more than thirty minutes at a time, and she became easily frustrated, stressed, intolerant, and agitated during counseling sessions. (Tr. 143.) Ms. Stouder gave Peevy a "fair" prognosis, noting that she was making some "slow" progress in that she was attending regular counseling sessions, calling less frequently in crises between sessions, and engaging in some baking and domestic activities at home. (Tr. 144.)

On August 3, 2004, Ms. Stouder provided a follow-up report in which she noted that Peevy had continued weekly counseling sessions. (Tr. 146.) Ms. Stouder stated that Peevy presented with major depression without psychotic features and major grief issues concerning her father's death. (Tr. 146.) She reported that Peevy had made mild improvement in energy and concentration, though her appetite and sleep disturbances continued. (Tr. 146.) She further noted that Peevy had reported periods of suicidal ideation, but that she had no actual plans and addressed those feelings with the coping skills she learned in therapy. (Tr. 146.) Ms. Stouder further opined that though Peevy was beginning to do basic tasks around the house, she was "unable to work" because she would be "unable to concentrate and stay on task for long periods of time." (Tr. 146.)

5

Between May 3 and August 27, 2004, Peevy also saw Dr. Theresa Tallon, her family practitioner. (Tr. 155-61.) Dr. Tallon noted Peevy's continuing struggles with anxiety and situational depression, but by July 2004 some improvement was observed. (Tr. 156, 160.) During this time, Peevy was prescribed various medications, including Zoloft, Risperdal, Desyrel, Paxil, and Ambien. (Tr. 155-61.) On May 21, 2004, Dr. Tallon opined that Peevy was going through a serious stage of depression, anxiety, low self esteem, and low motivation, but was hopeful that her medication regimen would cause improvement, though she noted that it may not. (Tr. 158.) She further stated that she was encouraging Peevy to explore vocational training so that if the medications did improve her condition, she would be able to find a better job. (Tr. 159.) On July 27, 2004, Dr. Tallon diagnosed Peevy with situational or reactive depression, improving, and obsessive compulsive disorder, improving, and described her as "much happier and doing so much better." (Tr. 156.) On August 27, 2004, Dr. Tallon reported that Peevy was able to do some physical work but was limited because of her depression and anxiety. (Tr. 154.) Dr. Tallon further noted that Peevy had signed up for culinary arts classes, which Dr. Tallon thought would help her "stay[] busy" though she noted that Peevy was still having trouble interacting with other people. (Tr. 154.)

On June 10, 2004, F. Kladder, a state agency psychologist, reviewed Peevy's medical record. (Tr. 166-83.) He concluded that she had a moderate degree of limitation in her daily living activities; social functioning; maintaining concentration, persistence or pace; and had one or two episodes of decompensation of an extended period of time. (Tr. 176.) He also found that she was moderately limited in her ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be

6

punctual with customer tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace; and the ability to maintain socially appropriate behavior. (Tr. 180-81.) Dr. Kladder concluded that despite these limitations, Peevy retained the functional capacity to perform simple work-like activities on a routine basis. (Tr. 182.) A second state agency psychologist later affirmed Dr. Kladder's findings. (Tr. 26, 166.)

On August 31, 2004, Peevy was evaluated by Kenneth Bundza, Ph.D., at the request of the Social Security Administration. (Tr. 162-65.) Dr. Bundza noted that Peevy reported multiple symptoms typically associated with depression, including excessive crying, social isolation, and preoccupation with negative thoughts. (Tr. 162.) On mental status exam, Peevy's thinking was somewhat disorganized at times, as was her general behavior, and she had difficulty providing basic factual information. (Tr. 163.) She had difficulty maintaining attention and concentration at times. (Tr. 163.) In regard to her short-term memory and attention span, Peevy was able to recall four digits forward and two digits backward; her mental math skills were limited to simple addition and subtraction. (Tr. 163.) She completed serial sevens up to sixty-five but made two errors. (Tr. 163.) He found that Peevy appeared to possess basic common sense, but her overall judgment and abstract thinking ability was compromised. (Tr. 164.) Dr. Bundza further stated that Peevy's mental status examination suggested the presence of some intellectual impairments, suspecting that she may be functioning at best in the borderline range of intelligence. (Tr. 164.) He diagnosed her with a major depressive disorder, recurrent, severe without psychotic features, and assigned her a GAF of 40. (Tr. 164-65.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On January 8, 2007, the ALJ rendered his opinion. (Tr. 11-19.) He found at step one of the five-step analysis that Peevy had not engaged in substantial gainful activity since her alleged onset date, and at step two that her depression and problems with concentration were severe impairments. (Tr. 18.) At step three, the ALJ determined that Peevy's impairment or

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

9

combination of impairments were not severe enough to meet a listing. (Tr. 19.) Before proceeding to step four, the ALJ determined that Peevy's testimony of debilitating limitations was "not entirely credible" (Tr. 21) and that she had the following RFC:

> [T]he claimant has the residual functional capacity to perform work that is limited to simple, routine and repetitive tasks. Limited to low stress jobs defined as occasional (up to 1/3 of the work day); changes in the work setting; no production rate pace work but rather goal-oriented work. Limited to occasional (up to 1/3 of work day) interpersonal interaction with co-workers, supervisors and the general public.

(Tr. 19.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Peevy was unable to perform any of her past relevant work. (Tr. 23.) The ALJ then concluded at step five that Peevy could perform a significant number of jobs within the economy, including maid (625 jobs), hospital cleaner (525 jobs), and mail sorter (400 jobs). (Tr. 18.) Therefore, Peevy's claim for DIB and SSI was denied. (Tr. 25.)

### C. The ALJ's Credibility Determination Will Be Remanded

In general, an ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in

reasoning rather than merely the demeanor of the witness . . . .").

Here, Peevy contends, among other things, that the ALJ erred when he discounted her credibility for failing to comply with her medication regimen without first inquiring about her reasons for doing so. Her argument has merit.[5]

Ostensibly in connection with his credibility determination, the ALJ articulated the following reasoning with respect to Peevy's failure to consistently comply with treatment:

> There is evidence that the claimant was non-compliant with her medication regimen. In this regard, Exhibit 4F indicates a GAF score of 50 but her treating source noted that the claimant failed to keep her appointments. On December 29, 2003 the claimant admitted she was not taking her prescribed medication (Sonata). She refused inpatient treatment and admitted on March 23, 2004 that she had stopped taking her prescribed medications but received Paxil 40mg each morning from Dr. Stiles. She was given samples of Ambien to help with her erratic sleep but admitted on April 6, 2004 that she was not taking the medication samples given to her.
>
> In May 2004 the claimant admitted that there were jobs available but her condition deteriorated and she was unable to function on the job. By July 27, 2004 Dr. Tallon noted the claimant was doing well on 50mg Zoloft and 100mg Desyrel. In fact, she was more motivated and signed up for classes in culinary and baking arts. She was described as much happier and doing better overall. The evidence clearly indicates the claimant was non-compl[ia]nt with her treatment regimen which may account for her inability to engage in work related activities at that time.
>
> The undersigned would note that as a general rule "In order to get benefits, a claimant must follow treatment prescribed by her physician if this treatment can restore her ability to work." Thus, if a claimant does not follow prescribed treatment without good reason, she is not disabled under the regulations.

---

[5] Peevy also argues, and rightly so, that it is somewhat unclear whether the ALJ merely intended to discount her credibility because she did not consistently comply with treatment or whether he intended to deny her disability under the failure-to-follow treatment regulation, 20 C.F.R.§§ 404.1530 and 416.930. (*See* Opening Br. 14-15.) It ultimately does not change the outcome here because if the ALJ instead intended to deny Peevy disability under 20 C.F.R.§§ 404.1530 and 416.930 for her failure to comply with treatment, he violated Social Security Ruling 82-59, which, among other things, states that "[t]he claimant should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment." Therefore, a remand would be warranted on that basis as well. *See, e.g.*, *Lopez-Navarro v. Barnhart*, 207 F. Supp. 2d 879, 882-84 (E.D. Wis. 2002).

(Tr. 21-22 (internal citations omitted)).)

Indeed, Social Security Ruling 96-7p states that a claimant's testimony may be less credible if "the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." However, it further cautions that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment *without first considering any explanations that the individual may provide, or other information in the case record*, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p (emphasis added); *see Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("[T]he ALJ 'must not draw any inferences' about a claimant's condition from [the] failure [to comply with treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." (quoting SSR 96-7p)); *Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005) ("[T]he ALJ could rely on [the claimant's] non-compliance as long as he had first considered [the claimant's] explanations for her non-compliance."); *Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1097 (E.D. Wis. 2001).

Here, despite the fact that he seemed to heavily rely upon Peevy's failure to consistently comply with treatment to discredit her, the ALJ never asked Peevy at the hearing any questions about why she failed to consistently keep her appointments and take her medication. In fact, at one point when Peevy on her own accord began to explain why she did not begin ECT when it was recommended, the ALJ interrupted her, cutting off her explanation. (*See* Tr. 213-14.) Therefore, the ALJ failed to consider any explanations that Peevy may have provided about her failure to pursue regular treatment and consistently take medication. *See Brown v. Barnhart*, 298

F. Supp. 2d 773, 797 (E.D. Wis. 2004) (stating that the ALJ "may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner"); *Brennan-Kenyon v. Barnhart,* 252 F. Supp. 2d 681, 697 (N.D. Ill. 2003) (remanding case where the ALJ failed to adequately develop the record concerning the claimant's reasons for not seeking medical treatment); *Anderson v. Barnhart*, No. 01 C 5083, 2002 WL 314410, at *9 (N.D. Ill. Feb. 28, 2002) (same).

Nor is there evidence that suggests the ALJ considered the explanations actually in the record for Peevy's failure to consistently take her prescribed medications and attend follow-up visits. *See Conner v. Barnhart*, No. 1:04CV0469-JDT-TAB, 2005 WL 1939951, at *5 (S.D. Ind. June 28, 2005) "[U]nder SSR 96-7p and related case authority, the ALJ has a duty to investigate reasons of non-compliance when determining the credibility of a claimant."). For example, the record reflects that at one point Peevy stopped taking one of her medications due to its side effects. (Tr. 157.) *See, e.g.*, *Khan v. Chater*, No. 96 C 2872, 1997 WL 669764, at *4 (N.D. Ill. Oct. 22, 1997) (remanding ALJ's credibility determination where the ALJ inappropriately drew a negative inference about the severity of plaintiff's pain based on plaintiff's failure to take prescription medication, without considering plaintiff's statement that the prescription medication caused him adverse side effects).

And, before the ALJ interrupted her at the hearing, Peevy started to explain that she did not undergo ECT because her oldest daughter did not approve and because Peevy thought she would simply "pop out of this mess [of depression.]" (Tr. 213-14.) In that regard, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment

13

in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)). "Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment[.]" *Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006).

In fact, the ALJ seems to have disregarded the very nature of Peevy's disorder in connection with her noncompliance. The Seventh Circuit Court of Appeals has recognized that "mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (internal citations omitted). Yet, the ALJ's credibility determination leaves us wondering whether the ALJ considered the episodic nature of Peevy's mental health condition when determining her credibility. *See generally Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (emphasizing that when important evidence is left unmentioned by the ALJ, the Court is "left to wonder whether the [evidence] was even considered" at all).

Admittedly, the ALJ provided several other reasons to discredit Peevy. He noted that she attended vocational school in 2004 and 2005 for several months; that she was "beginning to perform basic tasks around the house and basic self-care" by August 2004; and that Dr. Tallon said in August 2004 that she could perform some type of physical work and that she was not feeling as depressed or anxious, though she still had trouble interacting with other people. (Tr. 21.)

Yet, in that regard, Peevy quit school several months after each of her attempts because of her depression, and the daily living activities that she performed were no more than minimal

14

in nature. *See Carradine*, 360 F.3d at 755 (remanding an ALJ's credibility determination when the ALJ failed "to consider the difference between engaging in sporadic physical activities and [the claimant's] being able to work eight hours a day five consecutive days a week"); *DeCoito v. Astrue*, No. 1:07-cv-0330-SEB-TAB, 2008 WL 906164, at * 6-8 (S.D. Ind. Mar. 31, 2008) (same); *see also Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (same). And, while Dr. Tallon did indeed begin to note improvements in Peevy's mental health in August 2004, at the same time she opined that Peevy was still "limited in the sense that she is having a lot of depression, a lot of anxiety especially relating with other people." (Tr. 154.)

Therefore, the ALJ's other reasons for discounting Peevy's credibility do not assuage the Court's concern that the ALJ heavily relied on Peevy's failure to comply with treatment to reach his conclusion. *See Wadsworth v. Astrue*, No. 1:07-cv-0832-DFH-TAB, 2008 WL 2857326, at *9 (S.D. Ind. July 21, 2008) (concluding that the ALJ's failure to consider the plaintiff's explanation for not seeking medical treatment on a regular basis was not a harmless error, even though the ALJ provided "a detailed series of reasons for his finding"). Consequently, the case will be remanded so that the ALJ may reassess the credibility of Peevy's complaints in accordance with Social Security Ruling 96-7p.[6] *See Brindisi ex rel. Brindisi v. Barnhart*, 315

---

[6] Peevy also argues that the ALJ's consideration of the medical opinions of Dr. Bundza, Ms. Stouder, and Dr. Tallon is not supported by substantial evidence.

The ALJ assigned "little weight" to the opinion of Dr. Bundza, the psychiatrist who examined Peevy at the request of the state agency and assigned her a GAF of 40. (Tr. 23.) In reaching this conclusion, the ALJ explained rather conclusorily that Dr. Bundza's opinion was "not supported by the objective medical records of evidence or [Peevy's] treatment records." (Tr. 23.) The record, however, defies the ALJ's assertion, as Dr. Bundza performed a mental status examination on Peevy, and thus his opinion *is* supported by objective medical evidence. Most likely, the ALJ instead discounted Dr. Bundza's opinion because he thought it was inconsistent with other substantial evidence of record, for example, Dr. Tallon's opinion. Nonetheless, the Court should not be forced to speculate

F.3d 783, 787 (7th Cir. 2003) ("In evaluating the credibility of statements supporting a Social Security application, we have noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p.").

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Peevy and against the Commissioner.

SO ORDERED.

Enter for this 18th day of March, 2009.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge

---

about the ALJ's reasoning. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Hemphill v. Barnhart*, No. 01 C 6556, 2002 WL 1613721, at *8 (N.D. Ill. July 18, 2002) ( "[N]o court should be forced to engage in speculation as to the reasons for an ALJ's decision." (citation omitted)).

Ultimately, the ALJ relied on the opinions of Dr. Tallon and Ms. Stouder (countersigned by Dr. Wieland), explaining that he gave "controlling evidentiary weight to the opinions of her treating physicians because these records comprise a longitudinal history." (Tr. 23.)  Yet, if the ALJ found Dr. Bundza's opinion to be inconsistent with Dr. Tallon's and Ms. Stouder's opinions, then these two opinions should *not* have been afforded "controlling" weight, as a treating physician's opinion is never entitled to controlling weight if it is inconsistent with other substantial evidence of record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).  Also, the ALJ seemed to selectively view Ms. Stouder's opinion, in that he assigned controlling weight to her GAF score of 55 but at the same time gave little credence to her opinion that Peevy could attend to a simple work routine for only thirty minutes at a time and was "unable to work." (Tr. 143, 146.) *See generally Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("The ALJ must evaluate the record fairly.").

Therefore, upon remand the ALJ is encouraged to revisit his analysis of the opinions of Dr. Bundza, Ms. Stouder, and Dr. Tallon.

16